# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 8, 2026                    Decided July 28, 2026

No. 18-1149

ENVIRONMENTAL DEFENSE FUND, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND LEE M. ZELDIN,
RESPONDENTS

AIR PERMITTING FORUM, ET AL.,
INTERVENORS

———

Consolidated with 21-1039, 21-1259, 25-1176

———

On Petitions for Review of Final Actions
of the Environmental Protection Agency

———

*Sanjay Narayan* argued the cause for petitioners.  With him on the briefs were *Keri N. Powell, Vickie L. Patton*, *Surbhi Sarang*, *Caroline E. Cress*, *John D. Walke*, and *Emily K. Davis*.

*Jin Hyung Lee*, Attorney, U.S. Department of Justice, argued the cause for respondents.  With her on the brief were *Adam R. Gustafson*, Principal Deputy Assistant Attorney

General, *Robert N. Stander*, Deputy Assistant Attorney General, and *Brian L. Doster*, Assistant General Counsel, U.S. Environmental Protection Agency.

*Elbert Lin* argued the cause for intervenor-respondents. On the brief were *Charles H. Knauss*, *Shannon S. Broome*, *Stephanie A. Maloney*, and *Andrew R. Varcoe*. *Kevin M. Dempsey*, *Leslie A. Hulse*, *Stacy R. Linden*, *Richard S. Moskowitz*, and *Peter C. Tolsdorf* entered appearances.

Before: HENDERSON, WALKER and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Environmental Defense Fund and several other environmental groups have petitioned for review of a rule that alters the Environmental Protection Agency's process to determine whether a stationary source of air pollution can be modified absent a permit under the Clean Air Act's New Source Review program. The petitioners have not persuaded us that the rule is contrary to law. Nor have they demonstrated that it is arbitrary or capricious. Accordingly, we deny their petitions.

## I. Background

First enacted in 1963 and substantially amended in the decades that followed, the Clean Air Act (Act) strives "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1); *accord S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886–87 (D.C. Cir. 2006). A model of "cooperative federalism" rather than "centralized federal control," *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 537 (2014) (Scalia, J., dissenting), the Act makes "the

States and the Federal Government partners in the struggle against air pollution," *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). It charges the Environmental Protection Agency (EPA) with promulgating and maintaining "national ambient air quality standards" (NAAQS) that limit the allowable concentration of certain pollutants. 42 U.S.C. § 7409(d)(1); *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014). And the Act requires each State, in turn, to submit to the EPA a State Implementation Plan (SIP) detailing how it will comply with the NAAQS. 42 U.S.C. §§ 7410, 7502(b). Every SIP must contain a New Source Review (NSR) program that regulates the construction and modification of stationary sources of air pollution. *Id.* § 7410(a)(2)(C), (I).[1] If a State fails to submit a SIP (or submits one that is inadequate), the EPA publishes a Federal Implementation Plan in lieu of the State. *Id.* § 7410(c).

The Act subdivides New Source Review into what are known as "major" and "minor" components. *See Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1280 (D.C. Cir. 2009) (Rogers, J., concurring in part and dissenting in part). Relevant here is the major NSR program. 42 U.S.C. §§ 7475(a), 7502(c)(5). That program is further subdivided into parallel processes for stationary "sources located in 'nonattainment' areas (i.e., areas which failed to meet [the] NAAQS)" and those located in attainment areas "(i.e., areas [that] met [the] NAAQS or where there was insufficient information to evaluate whether [the] NAAQS were met)." *New York v. EPA*, 413 F.3d 3, 12 (D.C. Cir. 2005) (per curiam).

---

[1] A stationary source is "any building, structure, facility, or installation which emits or may emit any air pollutant." 40 C.F.R. § 63.2.

The major NSR program principally regulates stationary sources that "directly emit[], or [have] the potential to emit, one hundred tons per year or more of any air pollutant," 42 U.S.C. § 7602(j); *accord id.* §§ 7475(a), 7502(c)(5), and requires entities that wish to construct or modify such a source "to obtain a permit before construction," *Nat. Res. Def. Council, Inc. v. EPA*, 725 F.2d 761, 764 (D.C. Cir. 1984).[2] The requirements to obtain a permit are stringent and can be costly. *See Sw. Pa. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir. 1998). For example, to obtain a permit for a source in an attainment area, an entity must establish that it will use the "best available control technology" for covered pollutants, 42 U.S.C. § 7475(a)(4), that its proposal will not contribute to pollution exceeding the NAAQS, *id.* § 7475(a)(3), and that a public hearing on the proposal has been held, *id.* § 7475(a)(2). And, on the other hand, to obtain a permit for a major source located in a nonattainment area, an entity must show that the source will comply with the "lowest achievable emission rate," *id.* § 7503(a)(2), and that its proposal includes "benefits" that "significantly outweigh the environmental and social costs imposed," *id.* § 7503(a)(5). Accordingly, whether an entity will be required to obtain an NSR permit for a major stationary source often has significant economic and environmental consequences.

This case involves which changes to an existing major stationary source constitute a "modification" for which an NSR

---

[2] "Because major sources have the potential to make a greater impact on NAAQS, Congress and the EPA have focused the vast majority of their regulatory efforts on Major NSR." *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012). Stationary sources not considered major remain subject to the minor NSR program. 42 U.S.C. § 7410(a)(2)(C); *see Luminant Generation Co. v. EPA*, 675 F.3d 917, 922 (5th Cir. 2012).

permit is required. 42 U.S.C. § 7411(a)(4). The Act defines a "modification" to include "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source." *Id.* The definition leaves open an important question: whether emissions increases should be calculated on a gross or a net basis. We answered that question in *Alabama Power Co. v. Costle*, concluding that an NSR permit need be obtained for a *net* source-wide emissions increase only. 636 F.2d 323, 401 (D.C. Cir. 1979) (as amended 1980). We further held that to be properly included in the net calculation, any emissions decrease must be "within the same source" as the emissions increase and "substantially contemporaneous" with that increase. *Id.* at 402. And we likewise concluded that the EPA enjoys discretion to exempt from NSR any modification expected to result in only a "de minimis" emissions increase. *Id.* at 400. For nearly fifty years, *Alabama Power* has provided the basic framework to determine whether a change to a major stationary source constitutes a modification that triggers NSR. The EPA has added detail to this framework through a series of rule-makings.

Less than a year after *Alabama Power*, the EPA defined a "[m]ajor modification," in relevant part, as "any physical change in or change in the method of operation of a major stationary source that would result in a *significant net emissions increase*." Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52676, 52735 (Aug. 7, 1980) (emphasis added).[3] The definition reflects a two-step

---

[3] In crafting a definition that encompasses only a *significant* net emissions increase, the EPA used its discretion to exempt from NSR any change expected to result in only a "de minimis" emissions increase. *Ala. Power*, 636 F.2d at 400; *see* Approval and Promulgation of Implementation Plans, 45 Fed. Reg. at 52698

process. *See New Jersey v. EPA*, 989 F.3d 1038, 1043 (D.C. Cir. 2021). At Step One, both the regulated entity and the permitting authority ask whether the proposed change will itself cause a non-de-minimis increase in emissions. Approval and Promulgation of Implementation Plans, 45 Fed. Reg. at 52698. If it will not cause such an increase, it is not a "modification" and no NSR permit is required. *Id.* If, however, the proposed change will itself significantly increase emissions, the regulated entity and the permitting authority move to Step Two and determine whether the increase will be offset by a source-wide emissions decrease. *Id.* An eligible emissions decrease must be 1) creditable and 2) contemporaneous with the corresponding emissions increase. *Id.*[4] If the planned emissions increase will in fact be offset by a creditable and contemporaneous source-wide emissions decrease, it is not a "modification" and no NSR permit is required. *Id.* Under this framework, then, an NSR permit is required only if a change to a stationary source will cause 1) "a significant emissions increase" and 2) "a significant net emissions increase" across the source. 40 C.F.R. § 52.21(a)(2)(iv)(A).

The EPA added more detail to the two-step framework in a 2002 rule-making. Baseline Emissions Determination, Actual-to-Future-Actual Methodology, Plantwide

---

(defining "'significant' in terms of *de minimis* thresholds for each pollutant subject to regulation under the Act").

[4] To be creditable, an emissions decrease must be "enforceable as a practical matter." 40 C.F.R. § 52.21(b)(3)(vi)(B). And to be contemporaneous with the relevant emissions increase, an emissions decrease must occur between the date five years before the construction resulting in the emissions increase begins and the date on which the emissions increase occurs. *Id.* § 52.21(b)(3)(ii).

Applicability Limitations, Clean Units, Pollution Control Projects, 67 Fed. Reg. 80186 (Dec. 31, 2002). The resulting rule is relevant in two respects. First, the EPA added the word "project" to its regulations as a stand-in for the unwieldy phrase "a physical change in, or change in the method of operation of, an existing major stationary source." *Id.* at 80248. Accordingly, an NSR permit is required for any "project," 40 C.F.R. § 52.21(b)(52), "which increases the amount of any air pollutant emitted by" a major stationary source, 42 U.S.C. § 7411(a)(4). Second, and separately, the EPA promulgated various recordkeeping requirements for any project that a regulated entity concludes will *not* cause a significant increase in emissions at Step One despite there being a "reasonable possibility" of the project causing such an increase. Baseline Emissions Determination, Actual-to-Future-Actual Methodology, Plantwide Applicability Limitations, Clean Units, Pollution Control Projects, 67 Fed. Reg. at 80279.[5]

The EPA sowed the seeds for this case in 2006 when it proposed a rule to allow what it called "project netting." Debottlenecking, Aggregation, and Project Netting, 71 Fed. Reg. 54235, 54248 (Sep. 14, 2006). Under the proposed project-netting framework, permitting authorities and

---

[5] In light of concerns that the "reasonable possibility" inquiry was too indeterminate, we initially remanded the 2002 rule to the EPA for it to provide a more detailed explanation or develop a suitable alternative. *New York*, 413 F.3d at 33–36, 44. The EPA responded by clarifying that any project expected to increase emissions by fifty per cent or more of the applicable significance threshold has a reasonable possibility of causing a significant emissions increase at Step One. Reasonable Possibility in Recordkeeping, 72 Fed. Reg. 72607, 72610 (Dec. 21, 2007). We subsequently upheld this clarified approach. *New Jersey*, 989 F.3d at 1049–51.

regulated entities would consider a project's emissions "increases *and decreases*" at Step One to determine whether the project would cause a non-de-minimis increase in emissions. *Id.* at 54248–49 (emphasis added). In the EPA's view, its past policy of counting only emissions increases at Step One led to confusion and "inconsistent implementation." *Id.* And revising the Step One inquiry to allow for project netting would constitute "sound policy" that streamlined the NSR process at the expense of only "negligible" environmental harm. *Id.* at 54249. Despite the purported benefits of project netting, the Agency ultimately declined to implement the proposed rule after concluding that further consideration was warranted. Aggregation and Project Netting, 74 Fed. Reg. 2376, 2381 (Jan. 15, 2009).

In 2018, then-EPA Director E. Scott Pruitt published an interpretive memorandum (Pruitt Memo) taking the view that "emissions decreases as well as increases are to be considered at Step 1 of the NSR applicability process, provided they are part of a single project." App. 1. In publishing the Memo, the Director breathed new life into the "project-netting" approach that the EPA tabled nearly a decade earlier. But it opted not to revive that term and instead labeled "the consideration of a proposed project's emissions increases and decreases at Step 1" as "project emissions accounting." App. 2.

The EPA later memorialized the project-emissions-accounting framework in a proposed rule (Accounting Rule). Project Emissions Accounting, 84 Fed. Reg. 39244 (Aug. 9, 2019). Under the proposed Accounting Rule, the EPA's regulations would mandate the consideration of the "sum of the difference" between existing emissions and post-construction emissions. *Id.* at 39248.[6] The proposed

---

[6] The EPA's regulations already contained this language for projects involving either existing emissions units *or* the construction

Accounting Rule also defined the "sum of the difference" to "include both increases and decreases in emissions." *Id.* at 39249. Taken together, these proposed revisions clarified the EPA's view that Step One requires a net calculation that accounts for a project's emissions increases and decreases.

In response to the Agency's request for feedback, several groups submitted comments. One group—consisting primarily of the petitioners here—argued that the proposed Accounting Rule was contrary to law and arbitrary or capricious, in part because measuring net emissions on a project-by-project basis (as opposed to a source-wide basis) invites entities to circumvent NSR by bundling "unrelated activities" into a single "project." App. 119.[7] That flaw was enabled and

---

of new emissions units. 40 C.F.R. § 52.21(a)(2)(iv)(C), (D); *see* Project Emissions Accounting, 84 Fed. Reg. at 39248. The EPA thus proposed to harmonize those regulations with the regulation for projects involving "multiple types of emissions units." Project Emissions Accounting, 84 Fed. Reg. at 39248.

[7] To understand circumvention, consider a hypothetical source that makes three changes: 1) a physical change increasing emissions by thirty tons, 2) a physical change increasing emissions by sixty tons, and 3) an *operational* change decreasing emissions by twenty-five tons. Assuming Step One's significance threshold is forty tons, the second change would proceed to Step Two absent project emissions accounting. But under the project-emissions-accounting framework, the second and third changes can be bundled (if they are part of the same project). Thus, whether the second change proceeds to Step Two or is filtered out at Step One would depend on whether the first change is part of the same project as the second and third changes. If it is not, both emissions-increasing changes would avoid NSR at Step One despite an overall emissions increase of sixty-five tons but a significance threshold of only forty tons.

exacerbated, the commenters contended, by the EPA's decision not to import Step Two's guardrails—namely, creditability and contemporaneity—into Step One. The EPA found these concerns to be unpersuasive and finalized the Accounting Rule in 2020. Project Emissions Accounting, 85 Fed. Reg. 74890, 74894–95 (Nov. 24, 2020).

Several environmental groups then petitioned this Court for review, seeking vacatur of the Pruitt Memo and the Accounting Rule, and several industry groups intervened to defend the Rule.[8]

## II. Analysis

### A. Standing / Scope of Review

Because jurisdiction must "be established as a threshold matter," we begin by considering whether the petitioners have standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).[9] We conclude that the Environmental Defense Fund (EDF) has standing and its standing is sufficient for us to reach the merits. *See Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

To establish associational standing, EDF must show, *inter alia*, that at least one of its members would "have standing to

---

[8] Some of the petitioners also sought review of the EPA's denial of a petition to reconsider the Accounting Rule (No. 21-1259) and its withdrawal of a proposed rule that would have clarified the definition of "project" and imposed enhanced recordkeeping and enforceability requirements on any entity using project emissions accounting to avoid NSR (No. 25-1176). Those petitioners do not seek any relief with respect to these actions nor do they present argument specific to them.

[9] Our statutory jurisdiction arises under 42 U.S.C. § 7607(b)(1).

sue in [his] own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).[10] In other words, it must show that one of its members "has suffered injury as a result of the [EPA's] putatively illegal conduct and that his injury both may be traced to the challenged conduct and is likely to be redressed by the judicial relief he seeks." *Nat'l Mar. Union v. Commander, Mil. Sealift Command*, 824 F.2d 1228, 1234 (D.C. Cir. 1987). EDF has made that showing.

The Tennessee Valley Authority (Authority) has been constructing two new methane combustion turbines at the Cumberland coal plant. The Authority has been able to do so without obtaining an NSR permit by relying on future (i.e., non-contemporaneous) emissions decreases. Accordingly, the Pruitt Memo and Accounting Rule have effectively authorized an interim period during which the new and yet-to-be-retired units can both operate, thereby increasing emissions.

James Arnett is a member of EDF and claims to be injured by the construction at Cumberland. Arnett resides near the plant and enjoys participating in various outdoor activities including exercise, bird watching and hiking. And he is concerned that increased emissions at Cumberland will expose him to levels of pollution that are unsafe and will frustrate his enjoyment of outdoor activities.

Arnett's alleged injury "suffices for Article III standing" because he has articulated a reasonable fear that increased emissions from the Cumberland plant will subject him to unsafe levels of pollution and frustrate his use and enjoyment

---

[10] We have little difficulty concluding that EDF has satisfied the other two elements of associational standing. It "seeks to protect" interests that "are germane to [its] purpose" and the participation of its individual members is not required. *Hunt*, 432 U.S. at 343.

of nearby outdoor areas. *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019). His asserted injury is "fairly traceable" to the challenged agency actions because the Authority has avoided New Source Review (and its environmental safeguards) by relying on non-contemporaneous emissions decreases that could not have been considered at Step One under the framework that predated the Pruitt Memo and Accounting Rule. *Allen v. Wright*, 468 U.S. 737, 751 (1984). And vacatur of the Pruitt Memo and Accounting Rule would likely afford Arnett redress by foreclosing the Authority's ability to increase emissions by simultaneously operating the new and yet-to-be-retired emissions units at Cumberland. *See Bennett v. Donovan*, 703 F.3d 582, 590 (D.C. Cir. 2013). Arnett has therefore demonstrated that he would enjoy standing had he personally challenged the Pruitt Memo and Accounting Rule.

Because Arnett would have standing in his individual capacity, EDF has standing in its associational capacity. *See Redden v. ICC*, 956 F.2d 302, 306–07 (D.C. Cir. 1992). And it may "bring any claims" that could lead to vacatur of the Pruitt Memo and Accounting Rule. *Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 478 (D.C. Cir. 2023); *accord Mozilla Corp. v. FCC*, 940 F.3d 1, 46–47 (D.C. Cir. 2019) (per curiam). We need not consider whether the other petitioners have standing. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

A second threshold issue relates to the scope of our review. The petitioners contend that the *Chenery* doctrine prevents us from sustaining the Accounting Rule on the basis that it is consistent with the best meaning of the Act, the EPA not having initially supported it on that ground. The well-known *Chenery* doctrine requires that "a reviewing court . . . must judge the propriety of [agency] action solely [on] the grounds invoked by

the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). In the petitioners' view, the EPA relied only on its policymaking authority derived from purported statutory ambiguity and the equally well-known—but recently rejected—*Chevron* doctrine as its basis for promulgating the Rule. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Accordingly, they contend we are limited to that rationale in deciding whether to sustain the Rule. We disagree.

To start, the *Chenery* doctrine's application in this case is far from certain. There is reason to think that the doctrine does not apply to a pure statutory interpretation question following *Loper Bright*. *See Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237–38 (D.C. Cir. 2026); *Alcocer-Vargas v. Bondi*, No. 20-72118, 2025 WL 2731001, at *8 (9th Cir. Sep. 25, 2025) (Barker, J., concurring). And it is unclear whether the doctrine is less stringent—and more forgiving of agency error—if the challenge is to a putative "procedural error[]" in a rule promulgated pursuant to the Act. 42 U.S.C. § 7607(d)(8).[11] But we need not resolve these questions today.

---

[11] The *Chenery* doctrine has long sat in "tension" with the APA's prejudicial-error provision. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 589 (2025). And the Clean Air Act's prejudicial-error provision appears more forgiving of agency error than the APA's analogous provision. *Compare* 42 U.S.C. § 7607(d)(8) ("In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made."), *with* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *see PPG Indus., Inc. v. Costle*, 659 F.2d 1239, 1241 (D.C. Cir. 1981) (observing that the Clean Air Act's prejudicial-error provision "preclude[s] our invalidation of [a] rule on procedural grounds without a much

The petitioners are correct that the EPA relied on policymaking authority derived from purported statutory ambiguity as a basis for promulgating the Accounting Rule. But they overlook the fact that the EPA also took the view that the Accounting Rule is consistent with "the best reading of" the Clean Air Act. Project Emissions Accounting, 85 Fed. Reg. at 74899. And when an agency offers multiple grounds for its action and "it is clear" that the agency would have taken the same action based on one of those grounds alone, we can sustain the action solely on that ground. *Salt River Project Agric. Improvement & Power Dist. v. United States*, 762 F.2d 1053, 1060 n.8 (D.C. Cir. 1985); *accord Carnegie Nat. Gas Co. v. FERC*, 968 F.2d 1291, 1294–95 (D.C. Cir. 1992). In our view, it is clear that the EPA would have promulgated the Accounting Rule even in the absence of any policymaking

---

stronger showing of prejudicial error than is required in cases under the APA"); *Ohio v. EPA*, 603 U.S. 279, 318 (2024) (Barrett, J., dissenting) (observing that the Clean Air Act's prejudicial-error provision is "stringent" and "appears 'tailor-made to undo' any 'rigid presumption of vacatur' that might apply in other contexts" (quoting Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 291 (2017))); *see also Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 857–58 (D.C. Cir. 2024) (declining to determine whether the EPA's failure to explain adequately a portion of a proposed rule was error because there was "no 'substantial likelihood' that [the] EPA would have 'significantly changed' its final rule" absent the alleged error (quoting 42 U.S.C. § 7607(d)(8))); *Husqvarna AB v. EPA*, 254 F.3d 195, 202–03 (D.C. Cir. 2001) (declining to determine whether the EPA's purported failure to allow a sufficient opportunity to comment on a proposed rule was error because the petitioner failed "to establish a substantial likelihood that the rule would have been significantly changed if it had had an expanded opportunity to comment").

authority derived from purported statutory ambiguity.[12] Thus, assuming that the *Chenery* doctrine applies, it does not prevent the EPA from arguing that the Accounting Rule is consistent with the best meaning of the Clean Air Act.

## B. Contrary to Law

On the merits, the petitioners mount three arguments as to why the Accounting Rule is contrary to law. None persuades us.

The petitioners first contend that by utilizing a project-specific approach at Step One and a source-wide approach at Step Two, the Accounting Rule assigns inconsistent meanings to the statutory term "modification." 42 U.S.C. § 7411(a)(4). It does not. Although they are correct that the Act does not "establish[] two different definitions of 'modification,'" they are incorrect that the Accounting Rule rests on contradictory meanings of that word. *Ala. Power*, 636 F.2d at 403; *see Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). A "modification" is a change that causes a (non-de-minimis) net, source-wide emissions increase. *Ala.*

---

[12] Indeed, the EPA consistently stated its view that the project-emissions-accounting framework was both 1) consistent with the best meaning of the Act and 2) sound policy. The idea that the EPA would have forgone promulgation of a rule it believed to be legally sound and desirable as a policy matter had it known it would not receive *Chevron* deference seems unlikely especially because, at the time the Pruitt Memo was published in 2018, the future of *Chevron* was already in doubt. *See Michigan v. EPA*, 576 U.S. 743, 750–60 (2015) (finding an EPA rule interpreting the Clean Air Act to be unreasonable and declining to afford *Chevron* deference).

*Power*, 636 F.2d at 401–03. The Accounting Rule recognizes two scenarios that do not fit that definition. The first, long considered at Step Two, occurs when an offsetting change ensures there is no net, source-wide emissions increase—even if an individual change increases emissions. Project Emissions Accounting, 85 Fed. Reg. at 74890. The second, now considered at Step One, occurs when an individual change—a "project," in the EPA's parlance—does not increase emissions in the first place. *Id.* A project that does not itself increase emissions, the EPA correctly determined, cannot simultaneously increase source-wide emissions. At each step, then, the EPA defines "modification" consistently and in line with the statutory definition. The steps simply represent the EPA's identification of multiple circumstances that do not fit that definition.

We also note that the EPA has long utilized a two-step process to determine the applicability of New Source Review, with Step One looking to the effects of a particular project and Step Two looking to the net effects of all projects across the source. *See* Baseline Emissions Determination, Actual-to-Future-Actual Methodology, Plantwide Applicability Limitations, Clean Units, Pollution Control Projects, 67 Fed. Reg. at 80190 (explaining that it "has always been" the EPA's policy to use "a two-step process" to determine "whether a major modification has occurred"). And the Accounting Rule brings the two steps into greater harmony by discarding a framework that required a gross calculation at Step One and a net calculation at Step Two in favor of a framework that requires a net calculation at both steps. Thus, even if the petitioners were correct that the EPA is ascribing inconsistent meanings to "modification," the source of the inconsistency would be the EPA's longstanding two-step NSR framework rather than the Accounting Rule's modification of that framework. The petitioners do not challenge the

correctness of the overarching two-step framework and therefore we do not reach the issue. *See Price v. U.S. Dep't of Just. Att'y Off.*, 865 F.3d 676, 683 (D.C. Cir. 2017).[13]

The petitioners next argue that the Accounting Rule "excises 'any' from" the Clean Air Act's definition of "modification" by allowing certain emissions-increasing projects to avoid NSR. Opening Br. 49 (quoting 42 U.S.C. § 7411(a)(4); *see* 42 U.S.C. § 7411(a)(4) ("The term 'modification'" includes "*any* physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source." (emphasis added)). We disagree.

The Act does not require NSR whenever a *project* increases emissions. On the contrary, it requires NSR for "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source." 42 U.S.C. § 7411(a)(4). No doubt, a project that itself increases emissions is a "physical change in, or change in the method of operation of, a stationary source." *Id.* But if the project's emissions increases are offset by emissions decreases, the project does not "increase[] the amount of any air pollutant emitted by [the] source." *Id.*; *see New York*, 413 F.3d at 11 (explaining that the statutory definition of modification "requires *both* a change—whether

---

[13] The intervenors suggest that the petitioners do in fact mount a challenge to the overarching two-step framework. *See* Intervenor Br. 19 ("Petitioners' claim appears to be focused on whether [the] EPA may implement a two-step approach *at all*, without regard to how emissions are determined [at] step one."). We do not have that understanding of the petitioners' argument. Indeed, the petitioners seek to revive a variant of the two-step framework that predated the Accounting Rule.

physical or operational—*and* a resulting increase in emissions of a pollutant"). Thus, the Accounting Rule gives full effect to the word "any" in the statutory definition of "modification." 42 U.S.C. § 7411(a)(4).

The petitioners' third argument is that the Accounting Rule is contrary to law because entities can avoid NSR at Step One by relying on an emissions decrease that occurs *after* a project causes an emissions increase. Although we conclude that their challenge fails, we recognize that they identify factors that may preclude particular applications of the Accounting Rule. The petitioners do not distinguish between emissions decreases that occur shortly after an emissions increase and those decreases that occur well after an increase. In other words, they seem to argue that NSR is required for any significant increase in emissions that is not immediately offset by corresponding emissions decreases. *See, e.g.*, Opening Br. 52 (arguing that the EPA improperly eliminated "any requirement that an anticipated emission decrease from a change be achieved *before* any increase"). But we have never read contemporaneity so strictly. In *Alabama Power*, we held that offsetting decreases need only be "*substantially* contemporaneous" with emissions increases and the EPA enjoys "discretion, within reason, to define which changes are substantially contemporaneous." 636 F.2d at 402 (emphasis added). And we reaffirmed that principle in *New York*, holding that the EPA did not run afoul of the Clean Air Act when it allowed sources to satisfy the substantial contemporaneity requirement by establishing an emissions baseline with data that predated an emissions increase by up to ten years. 413 F.3d at 36–38.[14] The EPA's failure to require strict contemporaneity at Step One, then, does not invalidate the Rule.

---

[14] We recognize that in *New York* we afforded the EPA deference that we would not afford it today. 413 F.3d at 36–37. But

That is not to say, however, that the Accounting Rule lacks any contemporaneity problem. We recognize the petitioners' concern regarding the EPA's failure to establish a temporal "boundary [defining] a source's ability to offset emissions increases with decreases." Opening Br. 60. And depending on how it is applied to particular projects, the Rule might not satisfy the substantial contemporaneity test that *Alabama Power* and *New York* set forth. Nevertheless, the fact that the Accounting Rule "may be invalid as applied in such cases . . . does not mean that [it is] facially invalid." *INS v. Nat'l Ctr. for Immigrants' Rts, Inc.*, 502 U.S. 183, 188 (1991); *accord Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 667–68 (D.C. Cir. 2019). In fact, the petitioners have identified a handful of examples of entities pursuing so-called "delayed-decrease projects" but they have not developed an as-applied challenge with respect to these or any other projects. Reply Br. 27. And "[c]ourts do not resolve unspecified as-applied challenges in the course of resolving a facial attack." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 476 n.8 (2007). Accordingly, we hold that the Accounting Rule is not facially unlawful and reserve questions regarding the Rule's particular applications for another day.[15]

---

"cases that relied on the *Chevron* framework . . . are still subject to statutory *stare decisis*." *Loper Bright*, 603 U.S. at 412.

[15] Because the petitioners have not mounted an arbitrary-or-capricious challenge to the EPA's approach to contemporaneity at Step One, we need not consider whether such a challenge would have merit. *Cf. Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("Agency action may be consistent with the agency's authorizing statute and yet arbitrary [or] capricious under the APA.").

## C. Arbitrary or Capricious

The petitioners contend that the Accounting Rule is arbitrary or capricious because 1) regulated entities can circumvent NSR by bundling unrelated activities into a single project, and 2) the EPA failed to explain how its existing recordkeeping rules are sufficient to ensure compliance with NSR under the project-emissions-accounting framework. Neither challenge succeeds.

The petitioners' circumvention argument is twofold. They appear to suggest that the EPA broke a promise to implement a binding rule that would limit the definition of "project" to those activities that are "substantially related" to one another. And they contend that the Agency's non-binding interpretive rule containing that definition is insufficient to prevent entities from circumventing NSR by aggregating unrelated activities into a single project. We disagree on both fronts.

To start, the EPA did not break any promise to adopt a binding rule limiting the scope of a project to changes that are "substantially related" to one another. Opening Br. 65 (quoting Project Emissions Accounting, 85 Fed. Reg. at 74894). Indeed, the Agency explicitly acknowledged the non-binding nature of its interpretive rule setting forth that test. *See* Project Emissions Accounting, 85 Fed. Reg. at 74895 n.57 ("The EPA notes . . . that state and local air agencies with approved SIPs are . . . not required to amend their plans to adopt the interpretation that projects should be aggregated when 'substantially related.'"). Thus, there is no false assumption or unmet promise that might render the Accounting Rule arbitrary or capricious.

We also disagree with the petitioners' contention that the EPA's decision not to implement the "substantially related" test as part of a binding rule renders the Accounting Rule

arbitrary or capricious. At the outset, we reject their suggestion that the absence of a binding rule adopting the test leaves entities free to evade NSR by bundling unrelated activities into a single project. Entities wishing to aggregate at Step One are bound by the Act's definition of "modification," 42 U.S.C. § 7411(a)(4), as well as the regulatory definition of "project," 40 C.F.R. § 52.21(b)(52). And any entity that uses project emissions accounting in a manner that contravenes these definitions is subject to "compliance and enforcement" proceedings, including proceedings under Title V of the Clean Air Act. *Util. Air Regul. Grp.*, 573 U.S. at 309.[16] That the EPA adopted an interpretive rule that "advise[s] the public of the agency's construction of the statute[] and rules which it administers" should allay the petitioners' concerns. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation modified). After all, if the EPA failed to abide by its own interpretive rule setting forth the "substantially related" test, that failure could be seen as arbitrary. *See Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1118 (D.C. Cir. 2024).

Relatedly, we are satisfied with the EPA's explanation for declining to promulgate a binding rule adopting the "substantially related" test. It considered adopting a binding rule but ultimately decided against it. *See* Regulations Related to Project Emissions Accounting; Withdrawal of Proposed Rule, 90 Fed. Reg. 34206, 34207 (July 21, 2025). In the EPA's view, existing guidance and regulations are sufficient to combat over-aggregation and under-aggregation, especially in the absence of these phenomena "in prior permitting

---

[16] Indeed, the EPA has used the Title V petition process to correct one State regulator's misunderstanding of what constitutes a "project." *See* Regulations Related to Project Emissions Accounting, 89 Fed. Reg. 36870, 36878 n.65 (May 3, 2024).

decisions." *Id.* Moreover, the Agency reasoned that its non-binding rule affords "needed flexibility for permitting authorities and regulated sources to consider [relevant] facts on a case-by-case basis." *Id.* In light of the deference we owe the EPA's predictive judgment regarding the adequacy of a non-binding "substantially related" test, we find its explanation sufficient. *See Am. Tel. & Tel. Co. v. FCC*, 832 F.2d 1285, 1291 (D.C. Cir. 1987).

We recognize that the EPA's "substantially related" test does not have the force the petitioners wish it had. But it is far from toothless. Further, the EPA reasonably explained its decision to forgo adoption of a more forceful alternative and thus we conclude that this arbitrary-or-capricious claim falls short.

Finally, we address the petitioners' contention that the EPA failed to explain adequately how its recordkeeping requirements ensure compliance with NSR under the project-emissions-accounting framework. We reject this argument as well.

The EPA has long required entities to maintain detailed records if they conclude at Step One that a project will not cause a significant emissions increase despite there being a "reasonable possibility" of the project causing such an increase. 40 C.F.R. § 52.21(r)(6). In promulgating the Accounting Rule, the EPA acknowledged concerns that its "reasonable possibility" regulations "are insufficient to guard against NSR circumvention as a result of considering emissions increases and decreases" at Step One. Project Emissions Accounting, 85 Fed. Reg. at 74903. But it declined to promulgate additional recordkeeping requirements. *Id.* In its view, potential civil penalties and criminal liability would adequately deter entities and individuals from manipulating

data and calculations to avoid NSR or the "reasonable possibility" recordkeeping requirements. *Id.* And in many (if not most) cases, projects not subject to the "reasonable possibility" recordkeeping requirements remain subject to similar, albeit less stringent, requirements under the minor NSR program. *Id.* The EPA could have adopted a more aggressive recordkeeping regime. But it took the view that its existing regulations strike an appropriate balance between "ease of enforcement and avoidance of requirements that would be unnecessary or unduly burdensome on reviewing authorities or the regulated community." *Id.* at 74902 (quoting Reasonable Possibility in Recordkeeping, 72 Fed. Reg. 72607, 72610 (Dec. 21, 2007)). We believe this explanation passes muster.

It is true, as the petitioners point out, that some projects that do not trigger the "reasonable possibility" recordkeeping requirements will fall outside the scope of minor NSR and therefore evade NSR recordkeeping. But we have never held that the EPA's recordkeeping requirements must secure "perfect NSR compliance." *New Jersey*, 989 F.3d at 1051 (quoting *New York*, 413 F.3d at 44 (Williams, J., concurring)). It is sufficient for the EPA "'to analyze the trade-off between compliance improvement and the burdens of data collection and reporting' and 'articulate a reasoned judgment as to why any proposed additional burden would not be justifiable in terms of the likely enhancement of compliance.'" *Id.* (quoting *New York*, 413 F.3d at 44 (Williams, J., concurring)). The EPA has cleared that modest hurdle and demonstrated that its decision to adopt the Accounting Rule without corresponding adjustments to its recordkeeping regime is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The arbitrary-or-capricious standard does not demand more.

24

* * *

For the foregoing reasons, we deny the petitions for review.[17]

*So ordered.*

---

[17] Because we deny the petitions, we do not resolve the EPA's conditional request for supplemental briefing regarding a remand-without-vacatur remedy. We note, however, that this issue was ripe when the EPA submitted its brief. When a party makes "no attempt to address [an] issue" in the ordinary course of merits briefing, we are disinclined to "remedy the defect." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983); *see Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 551 (D.C. Cir. 1988) (striking a supplemental brief that was "nothing more than a poorly disguised attempt to file a second main brief to advance arguments" omitted in the original merits brief).